MARSHALL and another, Plaintiffs and Respondents, vs. COLBURN, Defendant and Appellant: MILWAUKEE AUTOMOBILE MUTUAL INSURANCE COMPANY, Defendant and Appellant.

*October 10—November 5, 1957.*

For the appellant Russell H. Colburn there were briefs by *Johns, Roraff, Pappas & Flaherty* of La Crosse, and oral argument by *Daniel T. Flaherty*.

For the appellant Milwaukee Automobile Mutual Insurance Company there were briefs by *Hale, Skemp, Hanson & Schnurrer,* and oral argument by *L. E. Sheehan,* all of La Crosse.

For the respondents there was a brief and oral argument by *James C. McKenzie* of La Crosse.

STEINLE, J. The questions presented on this appeal are: (a) Under the evidence was Colburn excluded from coverage as an additional insured in the Nordrum policy as a matter of law? (b) Under the evidence was the Marshall automobile jointly owned by the husband and wife as a matter of law? and (c) Under the evidence was Colburn free from causal negligence as to lookout as a matter of law? Question (a) involves consideration of whether the provision in the liability insurance policy issued to Nordrum with respect to exclusion from coverage therein of persons operating a public garage, service station, etc., applied to Colburn under the existing circumstances. Question (b) involves consideration of whether the Marshall automobile was being operated at the time in question by Marshall's wife in the capacity of his agent, and also whether it was jointly owned by Marshall and his wife. By reason of the conclusions that we have reached herein, we are obliged to determine the last-stated question, viz., (c), in the affirmative, and therefore deem it unnecessary to decide the other two questions involved.

It appears from the evidence that on the evening before the collision in question, Ethel Nordrum, wife of Julius L. Nordrum, telephoned to Russell H. Colburn, operator of a public garage and service station in La Crosse, and arranged with Colburn to pick up the Nordrum car on the following morning, take Colburn's wife, Jean Colburn, to work, take the car to Colburn's garage for a tune up, and return it to the Nordrum home in the evening. The Nordrums and the Colburns were friends. Their homes were about a mile apart. Mrs. Colburn worked in a garment factory in La Crosse. Colburn drove his wife to work each morning before opening his place of business. Colburn called for the Nordrum car on the morning of the accident, took it to his home, and started from there with Mrs. Colburn for La Crosse. He proceeded 950 feet on Highway Z from his home when the collision occurred. Highway Z is 20 feet wide and of black-top

construction. At the site of the collision the road is level and straight. West thereof it continues on level for 300 feet and then gradually rises for 300 feet more to the top of a hill.

Edna A. Marshall is an employee at Metallics, Inc. The driveway to that firm's factory leads north from the highway. There is a parking-lot driveway directly across Highway Z from the factory driveway. The collision took place at about 6:30 a. m., on June 19, 1956, on the highway in front of the Metallics, Inc., property. In her testimony Edna A. Marshall said that she stopped her car on Metallics, Inc., driveway near the factory entrance. She stated that her purpose in stopping was to permit some fellow employees who had been passengers in her car, to leave the car. She stated that while her car was stopped, it faced west, and its left side, as was her guess, was parallel with the highway and three to four feet (in adverse examination, four to five feet) from the north edge of the black-top. As to the situation thereafter, she stated as follows (abridged form) :

### Direct Examination.

"After my passengers had been discharged I looked to see if any cars were coming on Highway Z and then proceeded to cross the highway. I am not sure but I think a car was coming from behind me, from the east, but I didn't see anyone coming toward me from the west. I signaled for a left turn by using the blinker lights on my car. I started out in low gear. I don't know if I had shifted up a gear before the accident happened but I doubt it. I have no idea as to the speed of my car. I have no opinion as to the time it took from where I started to where the accident happened. I never saw the defendant's car prior to the accident."

### Cross Examination.

"When I looked east there may or may not have been a car coming, I don't remember. When I looked to the west I saw no car coming. From where I was stopped there it is

950–1,050 feet west to the top of the hill and I could see clearly that entire distance. I looked and didn't see anything coming so proceeded to turn my car toward the south to go across Highway Z into the parking area on the south of the road. I was partly on the black-top when I suddenly heard and felt an impact on my car. At the moment of impact I am not sure exactly where the front of my car was, whether it was on the black-top or off of it but the front end of my car was somewhere near the south edge of the black-top. I hadn't seen Mr. Colburn's car and I didn't know where it came from. I didn't see his car until after my car finally came to a stop after the accident. After the accident I told Mr. Colburn I never saw you or I never seen you. I don't know where Mr. Colburn came from or where he was going except from what I was told. . . . From the time I started from my stopped position I continued to where the accident happened without again stopping. From the time I made an observation to the west before starting I never looked again to the west for oncoming traffic."

Russell H. Colburn's testimony with respect to the circumstances that existed after he drove the Nordrum automobile to his own home on the morning in question, is as follows (abridged form) :

"There is a hill close by my home. And I go down a slight grade after I leave my driveway as I approach the place where the accident happened. The Nordrum car has an automatic transmission. When I brought the Nordrum car to my house I just drove it into my yard and swung around toward the highway again. I waited there until my wife got out of our car and into the Nordrum car. From the top of the hill opposite my driveway to the place where the accident happened is 950 feet. I measured it with a 100-foot tape measure. The road for this distance is a straight road and there is no bend until you get beyond the Metallics plant where the accident happened. I would guess the distance from the bottom of the hill to the top of the hill or my driveway would be about 180 feet. From the bottom of the hill to where the accident happened I would guess is close to 500 feet. When I got to the bottom of the hill my speed was between 30 and 35 miles per hour and I continued until my

speed reached 40 miles per hour which is my top speed on the highway.

"Within 200 to 300 feet from the front door of the Metallics plant I was doing 40 miles per hour. When I first saw the Marshall car it was probably 200 feet away. I was going 40. The Marshall car was just parked there along the side of the highway facing Metallics on my left—the north side of Highway Z. It was facing due south. I didn't notice any blinker lights on the Marshall car. I then glanced to the right where several other cars were in a parking field and people walking around. I was concerned with them so I glanced to the right. Then when I looked back I saw the Marshall car moving on the highway. I should judge I was 70 to 80 feet from it then. It was just turning onto the black-top. My first reaction was, are they going to keep coming or are they going to stop and the second was to put on the brakes because I could see their car accelerating all the time. I testified at an adverse examination that it was going five to eight miles per hour. I didn't blow my horn because I didn't have time. I slammed on my brakes. I couldn't go to the right because there is a bank going down there where the cars travel into the parking lot and I didn't go to the left because I thought she might stop on the left side of the road and then I would have been just asking to get hit. There were no other cars coming toward me. I don't think it would have been possible to pass behind her car on the left side. When I hit her car the front end was on the right edge of the black-top and her car was practically taking up the whole road. The road is 20 feet wide and I assume her car was 17 feet long so that there was only about three feet of the highway left. I put on the brakes and skidded 37 feet according to the skid marks and was still going 20 to 25 miles per hour at the moment of impact. Both my wife and I were thrown forward when I slammed on the brakes. The damage to the Nordrum car which I was driving was all at the front end, the entire front end and the windshield was broken. The sun was not shining in my eyes nor bothering me as I approached the accident. I did not have my sun visors down."

A witness for the plaintiff, Luretta Post, testified that on the morning of the accident while she was standing on the

steps of her home (which according to measurements of record was 450 feet west of Metallics, Inc., property and north of Highway Z) she observed the car driven by Colburn as it passed her home. She estimated the speed of the car at 50 to 60 miles per hour. She stated that she also had a view of the Marshall car at the time. She further said that as the Colburn car was passing her home the Marshall car was traveling in a southerly direction at five to seven miles per hour and had already reached the center of the highway. It is to be noted that the evidence indicates that there is no special speed restriction on Highway Z in the locality. The trial court found that neither Colburn nor Mrs. Marshall was negligent as to speed.

The rationale of the trial court's finding with respect to Colburn's negligence as to lookout was expressed in the court's memorandum decision as follows:

"The court has had considerable difficulty in the matter of Mr. Colburn's negligence but has concluded that although Mr. Colburn observed the vehicle at a distance of some 200 feet as his car progressed down the highway and then turned as he properly should to observe what might be occurring on the other side of the highway (having the right at that point to rely on Mrs. Marshall's obedience to the rules of the road), nevertheless he could not ignore her existence on the opposite side of the highway and an efficient lookout in the court's opinion would have required him to return his vision to the opposite side of the road prior to the time that he did in view of Mrs. Marshall's considerable progress to and across the highway from the time that he first observed her and the time that he last observed her prior to the happening of the accident."

Colburn's testimony with reference to lookout was not disputed. It is apparent that he made an efficient observation when his car was about 200 feet from Metallics, Inc., driveway. At that time he saw that the Marshall car was stopped there. He then noticed the presence of people and cars in the

parking lot south of the highway. He made, as was proper, an observation of the driveway leading to said lot. He then made a second observation of the Marshall automobile. At that time he was 80 feet from Metallics, Inc., driveway. Mrs. Marshall was just turning her car onto the black-top. We fail to perceive improper lookout on Colburn's part in these respects. Having noted that the Marshall car was stopped when he was 200 feet from it, Colburn was entitled as a matter of law to assume that if the Marshall car was to be placed in motion from where it stood, and that the intention of its driver was to proceed in a southerly direction, said car would be stopped by the driver before crossing the north limits of the highway in accordance with the requirement of sec. 85.18 (8), Stats., which provides:

"*Vehicles emerging from alleys or private driveways to stop.* The operator of a vehicle emerging from an alley, private driveway, or garage shall stop such vehicle immediately prior to moving on to the sidewalk or sidewalk area extending across the path of such vehicle, or if there is no sidewalk or sidewalk area then before crossing the near limits of the roadway."

The situation is comparable to that in *Klas v. Fenske* (1946), 248 Wis. 534, 22 N. W. (2d) 596. There the court was confronted with circumstances relating to a driver (Gehrung) on an arterial highway observing a driver (Fenske) on a nonarterial intersecting highway approaching the arterial at which he was obliged by law to stop. The court said (p. 547):

"Gehrung having looked, having seen the car north of the arterial sign, was under no duty or obligation to look again, having the right to assume that Fenske would stop and that Fenske coming from his left would yield the right of way. If Fenske had stopped Gehrung would have had ample time to clear the intersection. But he did look when he was 60 feet from the intersection, and discovered that the Fenske car

was not stopping. After that he did everything that he could do under the circumstances to avoid the accident.

"Gehrung, in addition to having a right to rely upon Fenske's car stopping at the arterial sign, was obliged to look to the south where oncoming traffic, if any, would have the right of way over him."

In the *Klas Case* the court determined that Gehrung was confronted with an emergency in that while looking the last time and then being but 60 feet from Fenske, Gehrung discovered that the Fenske car was not stopping. In the instant matter Colburn had an obligation, after seeing that the Marshall car was stopped, to make an observation in the direction of the driveway leading to the south side of the highway, he previously having noted the presence of people and cars there. Such obligation was similar to that of Gehrung in *Klas v. Fenske, supra,* to look to the south for oncoming traffic after having looked to the north once, and before looking north again. It seems clear to us that in the situation here Colburn was confronted with an emergency just as was Gehrung in *Klas v. Fenske, supra.* Mr. Chief Justice ROSENBERRY, speaking for the court, in *Klas v. Fenske, supra,* said (p. 546):

"It is the well-settled law of this state that an automobile driver who, by the negligence of another, and not by his own negligence, is suddenly confronted by an emergency and is compelled to act instantly to avoid a collision or injury, is not guilty of negligence if he makes such a choice as a person of ordinary prudence placed in such a position might make, even though he did not make the wisest choice. *Drakenberg v. Knight* (1922), 178 Wis. 386, 190 N. W. 119; *Parkes v. Lindenmann* (1915), 161 Wis. 101, 151 N. W. 787."

Colburn, under the circumstances here, did not fail to make a proper and efficient observation.

We are obliged to determine that as a matter of law under the evidence of record the defendant Russell H. Colburn was free from negligence as to lookout.

160

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss the complaint upon its merits.

FAIRCHILD, J. (*dissenting*). The majority's holding upon the issue of Colburn's negligence is based upon a finding as a matter of law that Colburn's lookout was sufficient though he did not see Mrs. Marshall's car turning and moving until it was already "moving on the highway." Upon this record it seems to me that this issue is really one of fact and that the finding of the trial court determined the matter.

I am authorized to state that Mr. Justice CURRIE joins in this dissent.